## SMITH et al. v. UNITED STATES.

### No. 6662.

United States Court of Appeals for the District of Columbia.

Decided May 24, 1937.

William H. Collins, Harry T. Whelan, and W. B. O'Connell, all of Washington, D. C., for appellants.

Leslie C. Garnett, Henry A. Schweinhaut, and Howard Boyd, all of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

MARTIN Chief Justice.

This is an appeal from a conviction and sentence of appellants by the district court upon an indictment charging them, together with twenty-seven other defend-ants, with the crime of conspiring to violate the revenue laws of the United States prohibiting the sale of nontax paid distilled spirits.

Eight of the defendants appealed from the conviction to this court. Of that number, three have since dismissed their appeals. The remaining five defendants whose appeals are before the court and who will be referred to herein as the appellants are Albert H. Smith, Earl G. Funk, John Manoi, Belford R. Longnecker, and Arthur Bartolozzi.

The appellants rely upon three assignments of error.

The first assignment is that the jury that tried the case was illegally constituted by reason of the fact that certain employees of the United States government were permitted to serve as jurors over the objections of appellants. This assignment must be denied upon the authority of United States v. Raymond Wood, 299 U. S. 123, 57 S.Ct. 177, 81 L.Ed. 78, decided December 7, 1936. In that case it was held that employees of the United States government, residents of the District of Columbia, were not disqualified for jury service within the District merely because of their employment by the government.

The second assignment relied upon by appellants is that evidence secured by wire tapping was admitted by the trial court against the objections and exceptions of appellants. This assignment must be overruled upon the authority of Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944, 66 A.L.R. 376. See, also, Beard v. U. S., 65 App.D.C. 231, 82 F.(2d) 837. It is also alleged by appellants that such evidence was illegal under the provisions of the act of Congress commonly known as the Communications Act of 1934, section 605, tit. 47 U.S.C. (47 U. S.C.A. § 605). We cannot, however, sustain this contention. Olmstead v. United States, supra.

The third assignment of error is that the trial court erred in admitting in evidence certain written statements concerning facts which had no relation to the issues in the case and which were prejudicial to the rights of the appellants. In our opinion, this assignment must be sustained.

The defendants were charged in the indictment with unlawfully conspiring together to commit certain offenses in vio-

lation of section 37 of the United States Criminal Code, R.S. § 5440 (18 U.S.C.A. § 88), prohibiting the sale of nontax paid distilled spirits (R.S. § 3281 [superseded by Act Feb. 8, 1875, § 16, 26 U.S.C.A. §§ 1184, 1397 (a)]). It was charged that the defendants sold certain distilled spirits on which the internal revenue tax was not paid for the purpose of defrauding the United States government of the taxes due thereon; and that they maintained certain rooms at apartment 21, 1421 P street, N. W., Washington, D. C., as an office and place where telephones were maintained for the purpose of soliciting, receiving, and bartering nontax paid liquor and alcohol. Various overt acts with specifications of time and place were recited under the indictment.

At the trial the United States introduced evidence in support of these charges and in the course of the trial called one John Wise as a witness who testified that he was a detective sergeant in the Metropolitan Police Department; that in April, 1934, he made an investigation of the premises 1423 P street, N. W., in Washington, D. C., and that incident to this investigation he interviewed certain of the defendants, namely, Earl Funk, Charles Edward Hawkins, Leonard Smith, Clarence Ross, and Andrew Jackson, each of whom made statements in his presence which were reduced to writing and signed by the defendants making the same. These written statements were tendered by the government in evidence, whereupon the defendants objected and their objections being overruled they excepted.

The written statements in question are set out in full in the record, but it seems unnecessary to copy all of them in this opinion. They contain no reference in any manner to the sale of distilled spirits at the place referred to in the indictment or elsewhere, nor is any of the statements relevant to any of the issues made in the present case. They relate solely to a murder committed at the apartment 1423 P street on Saturday, April 21, 1934. They state that one Leonard Smith was engaged in a quarrel at the apartment with one Ernest Nelson, and killed him by a pistol shot; that Nelson's body was taken secretly in a truck to a point in the country near Washington and thrown out and left upon the roadside; that afterwards Smith was arrested as the murderer and it was in the preparation made by the detective Wise for the murder trial that the written statements now referred to were procured. One of the statements, that made by Leonard Smith, sometimes called "Bones," the murderer, reads as follows, to wit:

"Q. Bones, did you tell Mr. Joseph Kelly, your attorney, about the shooting up at Apartment 21—1423 P. St., N.W.? A. Yes, sir; I did.

"Q. Did Mr. Kelly tell you not to make a statement to no one? A. Yes, sir; even before I told him about the shooting.

"Q. Bones, do you own a car? A. Yes, sir; a Ford V-8 '33 Coupe District License #You-1205.

"Q. Where is this car now? A. My brother George has it at 1403—3rd St., N. W.

"Q. Bones, do you own a gun? A. No, sir.

"Q. You did have an automatic pistol at 1423 P Street, N.W., Apartment 21, did you not? A. Yes, sir.

"Q. What caliber gun was it? A. I don't know what it was.

"Q. This automatic that you admit having at this apartment 21—1423 P St., N. W.; was this the gun that was used in the shooting of Lefty Nelson? A. Yes, sir.

"Q. Where is that automatic pistol now? A. I left it there when I left.

"Q. Who was there when you left? A. No one at all.

"Q. The dead man, Ernest Nelson, was there was he not? A. Yes, sir.

"Q. Where did you go after you left the apartment—1423 P St., Apartment 21? A. Up to 14th & You Sts. N.W. to Earl Wine and Liquor Store, where I got $5 from Smithy. I went up there in a cab.

"Q. Where did you go from the liquor store? A. I went home to my apartment at 2232—8th St., N.W. Apartment 1.

"Q. What did you do then? A. I got my coat. I already had my sweater on and I got in my car and it wasn't running so good and I went around the reservoir around to North Capitol St. and W. St., N.W. where I looked over the car.

"Q. At the time you went into your apartment to put on your coat, was Blanche there then? A. She was in the back apartment and when I went out she went with me.

"Q. Did you tell Blanche about this shooting? A. Yes, sir.

"Q. Where did you go from North Capitol and W. Sts., N.W.? A. Down on O St., between North Capitol and First Sts., and left the car parked on O St., N. W. all night.

"Q. Where did you and Blanche go then? A. I went up to the corner of 1st and O Sts., N.W. where I sent a boy by the name of Tommy around to 1403—3rd St., N.W. to tell my brother George to come around there to 1st and O Sts., N. W.

"Q. Did your brother George come around there? A. Yes, sir.

"Q. Did you tell him about the shooting at 1423 P St., N.W.—Apartment 21? A. Yes, sir.

"Q. What did you next then do? A. My brother—Blanche and I walked down to North Capitol and O Sts., and then we gets in a cab and goes over northeast to 1231 Linden St., where I stays all night.

"Q. What time did you get up Sunday morning—April 22, 1934? A. 7:00 A. M.

"Q. Did anyone come over to 1231 Linden St., N.E. to see you after the shooting before you went to 14th and P Sts., N.W.? A. No one came over to see me but someone came over to get me.

"Q. Who came over to get you? A. Hawk, my brother George and another boy by the name of Sam.

"Q. What time was that? A. Around about 7:00 A. M.

"Q. Where did you then go? A. Up on P St.; my brother and Blanche did not go along, but Sam and Hawk did.

"Q. When you went up to P Street, what did you do? A. I went in back of the Rigg's Market to Fishboy's house with Hawk and Sam; while Fishboy was coming down the steps, Hawk and I left Sam talking to Fishboy and we went over to 1423 P St., N.W., Apartment 21, and then I sent Hawk to get my car to take it over and have it repaired while I stayed in the office.

"Q. While you were in that apartment, who came in? A. Clarence came in about half an hour after I was in there and then a little while later Hawk came back.

"Q. How long did you remain there? A. I went to sleep and I don't know what time it was when I woke up.

"Q. How long have you known Lefty Nelson? A. About a year and a half.

"Q. Have you ever had any trouble with him previous to Saturday night, April 21, 1934? A. Yes, sir. About four or five months ago Lefty and a fellow by the name of Jack Johnson came up to the apartment at 1423 P St., N.W. looking for Blanche and there was a boy by the name of Seabury—James Hayes and I in the apartment and Lefty ran us all out of the apartment with a portier stick about three feet long. Another time he came up looking for me and I wasn't there and that was the time he busted the door down and he had a pistol and he hit Hayes because Hayes would not tell him where I was and Lefty shot his pistol off three or four times out in the hall because Hayes would not let him into the apartment. And a later time he came up there looking for me and he had a pistol and he had been drinking and Monty Montgomery out-talked him and got the pistol away from him. That was about two months ago.

"Q. Bones, how many times did you shoot Lefty Nelson? A. I don't know how many times I shot him; the gun went off several times.

"Q. Is there anything further you care to tell about this shooting? A. No, I would be glad to tell you only my lawyer, Mr. Joe Kelly, told me not to make a statement.

"Q. Can you read and write, Bones? A. Yes, sir.

—————————."

[Unsigned]

It may be said without qualification that the written statements in question relate only to the murder of Nelson by Smith and do not refer in any manner, even remotely, to the issue made by the indictment in this case. It is not charged in any of them that any one of the appellants in this case took any part in the murder of Nelson, or was present at the time when it occurred; nor that any of them had any part in removing Nelson's body and disposing of it as above set out. The quarrel between Nelson and Smith had nothing to do with the sale of distilled spirits at the apartment but was personal in its nature, and apparently related to a woman.

It was contended by the prosecution that the statements should be read to the jury to show the connection of certain defendants with others of the defendants on April 21, 1934, and that this made them

admissible as the confession of one conspirator against another, showing a connection between the defendants as conspirators, and that if a conspiracy was not proven, the statements should be stricken. In point of fact, however, the written statements throw no light whatever upon the crime charged in the indictment nor do they tend to show a conspiracy between the defendants, and not only were they irrelevant, but they were objectionable as mere hearsay, being the unsworn statements of parties made in the absence of the appellants. None of the persons signing the statements were called as witnesses in the case.

■ At the close of the testimony the trial court instructed the jury that they should not be prejudiced against any of the defendants in any sense because of the manner in which the deceased, known as "Lefty" Nelson, came to his death or how his body was disposed of after the killing; that these statements were received upon the assurance of the district attorney that a conspiracy would be shown substantially as alleged in the indictment, and that some or all of the defendants on trial would be connected with that conspiracy and in the furtherance of the object of the conspiracy; that the jury were not concerned with the fact of the killing of the man Nelson, nor with the question as to who was at fault in that killing, but are concerned only with the question as to whether or not a conspiracy was formulated to violate the liquor tax law as stated in the indictment, and whether or not these defendants or some of them were connected with that conspiracy and were instrumental in furthering the unlawful object of the conspiracy, as described in the indictment; and that they should give the statements no effect whatever, unless they aided the jury in finding that there was a conspiracy, or if after having so found, they aided in determining that these defendants or some of them were members of the conspiracy.

We think that these instructions failed to cure the error committed by the court in admitting the statements to be read to the jury as evidence in the case. The statements bore absolutely no relevancy to the issue made by the indictment and tended only to confuse the jurors and lead them to associate the appellants with the murder. The statements relating to the murder and the ghastly disposition of the body of the murdered man could not fail to incite in the minds of the jurors a sense of suspicion and hostility toward the defendants upon the assumption that they would not have been introduced in the case unless they related in some manner to defendants. It should not have been left to the jury to decide what weight, if any, should be attached to the statements inasmuch as no weight at all could rightfully be attached to them as evidence in the case. Ryan v. United States, 26 App. D.C. 74, 83, 6 Ann.Cas. 633; Billings v. United States, 42 App.D.C. 413; Wright v. United States, 53 App.D.C. 74, 76, 288 F. 428; Hatchet v. United States, 54 App. D.C. 43, 293 F. 1010; Robinson v. United States, 57 App.D.C. 143, 18 F.(2d) 185; Crawford v. United States, 59 App.D.C. 356, 358, 41 F.(2d) 979; Howe v. United States, 61 App.D.C. 8, 9, 56 F.(2d) 305.

The judgment of the district court against the appellants Albert H. Smith, Earl G. Funk, John Manoi, Belford R. Longnecker, and Arthur Bartolozzi is reversed and the cause is remanded for further proceedings not inconsistent herewith.